## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ULYSSES HILL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-249** |
| **DARREL VANNOY, WARDEN** | **SECTION: "H"(1)** |

### REPORT AND RECOMMENDATION

Ulysses Hill, a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana, filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For all of the following reasons, **IT IS RECOMMENDED** that his petition be **DISMISSED WITH PREJUDICE**.

On March 15, 2005, petitioner was convicted of second degree murder under Louisiana law.[1] On April 13, 2007, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2] On December 9, 2009, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction but vacated his sentence because the state district court failed to rule on his post-verdict motions prior to sentencing.[3] His related writ application was then denied by the Louisiana Supreme Court on October 1, 2010.[4]

---

[1] State Rec., Vol. 2 of 13, transcript of March 15, 2005, p. 187; State Rec., Vol. 1 of 13, minute entry dated March 15, 2005; State Rec., Vol. 3 of 13, jury verdict form. The state district court thereafter granted petitioner's motion for a new trial, finding that he had received ineffective assistance of counsel at trial. However, the Louisiana Fourth Circuit Court of Appeal granted the state's related writ application, reversed the district court's grant of a new trial, and reinstated the conviction. State v. Hill, No. 2006-K-1554 (La. App. 4th Cir. Feb. 21, 2007); State Rec., Vol. 4 of 13.

[2] State Rec., Vol. 6 of 13, transcript of April 13, 2007; State Rec., Vol. 1 of 13, minute entry dated April 13, 2007.

[3] State v. Hill, No. 2009-KA-0469, 2009 WL 8679213 (La. App. 4th Cir. Dec. 9, 2009); State Rec., Vol. 6 of 13.

[4] State v. Hill, 45 So. 3d 1093 (La. 2010); State Rec., Vol. 12 of 13.

On March 23, 2011, the state district court denied the post-verdict motions and resentenced petitioner to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[5]  On May 30, 2012, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence,[6] and the Louisiana Supreme Court then denied his related writ applications on January 25, 2013,[7] and March 15, 2013.[8]

Petitioner thereafter filed both *pro se* and counseled applications for post-conviction relief with the state district court.[9]  Those applications were denied on December 10, 2015.[10]  Petitioner's related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on March 30, 2016,[11] and by the Louisiana Supreme Court on September 15, 2017.[12]

On January 9, 2018, petitioner filed the instant federal application seeking habeas corpus relief.[13]  The state filed a response conceding that the application is timely but arguing that petitioner's claims have no merit.[14]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in

---

[5] State Rec., Vol. 7 of 13, transcript of March 23, 2011; State Rec., Vol. 1 of 13, minute entries dated March 23, 2011; State Rec., Vol. 8 of 13, Judgment dated March 23, 2011.
[6] State v. Hill, 94 So. 3d 894 (La. App. 4th Cir. 2012); State Rec., Vol. 10 of 13.
[7] State v. Hill, 105 So. 3d 63 (La. 2013); State Rec., Vol. 12 of 13.
[8] State v. Hill, 109 So. 3d 373 (La. 2013); State Rec., Vol. 12 of 13.
[9] State Rec., Vol. 11 of 13.
[10] State Rec., Vol. 11 of 13, Judgment dated December 10, 2015.
[11] State v. Hill, No. 2016-K-0064 c/w No. 2016-K-0120 (La. App. 4th Cir. Mar. 30, 2016); State Rec., Vol. 11 of 13.
[12] State *ex rel.* Hill v. State, 225 So. 3d 470 (La. 2017); State Rec., Vol. 13 of 13.
[13] Rec. Doc. 3.
[14] Rec. Doc. 15.

reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." <u>Bell</u>, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and

nevertheless arrives at a result different from [United States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  <u>White v. Woodall</u>, 572 U.S. 415, 426 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.   AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

<u>Id.</u> (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  <u>Bell</u>, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect

application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (emphasis added; citations omitted); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White v. Woodall, 572 U.S. 415, 417 (2014).

## II. Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

A few minutes before 4:00 on the afternoon of July 18, 2004, Nolan Fields was shot to death in the St. Bernard Housing Project. An autopsy revealed that Fields sustained four gunshot wounds, two of which would have been fatal, as well as a grazing wound. The forensic pathologist who performed the autopsy retrieved four bullets from Fields' body, which when they were later tested, revealed that they had been fired from the same gun. Because of the lack of gunpowder residue on Nolan's body, the pathologist testified that the shots were fired from some distance from the victim. Bodily fluids taken from Nolan's body tested negative for ANY alcohol or other commonly-abused drugs.

Pursuant to various 911 calls, Off. Robert Monlyn and his partner responded to the shooting. In the 3900 block of Duplessis Street, they discovered Fields' body lying on the concrete. Fields was still alive, and EMS personnel transported him to a hospital. Off. Monlyn testified that at some point he received information indicating that a blue, two-door Thunderbird with a "K" in its license plate was involved in the shooting. On cross-examination, Off. Monlyn stated that he and his partner did not interview any witnesses on the scene because it was his experience that no witnesses to the shooting in that area would come forward. He stated that Anna Fields, the victim's sister, later identified the victim on the scene. Off. Monlyn's self-described role in the murder investigation was limited to maintaining the scene until crime lab personnel and the investigating officer arrived.

Detective James Kelly was the lead investigator on the case. Rather than respond to the scene of the shooting, he went to the hospital where the victim had been taken. Once there, however, he learned the victim had died. He spoke with the victim's family and learned from his sister that the defendant, Hill, was a suspect in the shooting. He stated, however, that Ms. Fields was not a witness to the shooting. She also told him that another man was walking with her brother when her brother was shot, but Det. Kelly was never able to contact this man. Det. Kelly got a call from another officer who told him that a car suspected to be involved in the shooting had been located. Det. Kelly described the car as a black Thunderbird with a "KW" or "KM" on its license plate. Det. Kelly went to the 3600 block of Hamburg Street, in the St. Bernard Housing Project, and found the car parked on the street. The owner of the car, Hill's sister Loretta Hill, who lived in the apartment complex in front of which the car was parked, soon came downstairs to ask why the officers were around her car. When he told her that the car was implicated in a shooting in the project, Ms. Hill stated that no one other than herself had driven the car, and she denied any knowledge of the shooting.

Det. Kelly testified that Ms. Hill stated that she had recently returned home from work and had driven through the area of the shooting, but she had not seen anyone outside at the time. She stated that she then went to pick up her boyfriend from work. She estimated that she picked up her boyfriend at around 3:15 p.m., and then the two went to her apartment. Det. Kelly later spoke with Ms. Hill's boyfriend, who told him that Ms. Hill picked him up around 4:30 p.m. Ms. Hill consented to a search of her car, but no evidence was seized from the car. She then agreed to go the police station, where she gave a statement.

The next day, Det. Kelly received a call from the victim's cousin, who indicated that she knew someone who wanted to speak to him about the shooting. He then met with Troy Lynn Solomon, who gave him information about the shooting. Ms. Solomon also gave a statement to the police. Based on this information, he obtained an arrest warrant for Hill and an arrest warrant for Loretta Hill.

On cross-examination, defense counsel questioned Det. Kelly in great detail about whether the information about the dark blue Thunderbird was contained in the 911 calls to the police. After some miscommunication on both parts, Det. Kelly ultimately testified that he received this information in a call from his sergeant, who had gotten the information from some other source that Det. Kelly did not know. He also testified that the police report indicated that although Ms. Fields identified the victim on the scene, she did not tell the responding officers that Hill was a suspect in the shooting. Det. Kelly stated that Ms. Hill was not a suspect at the time she gave her statement at the police station. He admitted that although the officer who interviewed Ms. Hill at the police station took notes while she gave her statement, he threw away these notes after incorporating the statement into his police report.

Det. Kelly also indicated that the police received Crimestopper tips that corroborated the information they received from Ms. Troy Lynn Solomon, the only eyewitness to the shooting, who identified the [sic] Hill. Ms. Solomon admitted that she had a prior conviction for passing worthless checks. She testified that she lived in the 3900 block of Duplessis Street. She stated that she was sitting on her back porch at approximately 3:00 p.m. on the afternoon of July 18, 2004. She saw Hill get out of a silver Malibu with tinted windows and go upstairs in the building next to hers, where Hill's brother lived. She estimated he was inside for fifteen to twenty minutes. She saw Nolan Fields and a man whom she identified only as "Dwanne" walk into the driveway. Fields was on his way to her apartment to get some keys. She also saw a black or dark blue car she described as a Monte Carlo drive into the driveway and park. She saw Hill emerge from the building next door, and he and the victim began talking and then arguing for five to ten minutes. She heard Hill accuse Fields of putting mud in Hill's gas tank, a charge that Fields denied. She heard Hill tell Fields that next time he would "deal" with him, and Fields turned and began walking away. Ms. Solomon testified that she then heard gunshots, even though she did not see a gun because Hill had his back to her. She estimated Hill shot five or six times, and she testified that after the first shot, she saw the Hill standing over Fields while more shots rang out.

Ms. Solomon identified Loretta Hill as the person who drove the dark blue car into the driveway, and Ms. Hill parked the car near the building she had seen Hill enter. After Ms. Hill turned the car around and parked it, she got out of the car and stood near the driver's side of the car. Ms. Solomon testified that Ms. Hill would have been able to see Fields and Hill arguing and would have seen the shooting from her vantage point. After Hill shot Fields, Ms. Solomon saw him and Ms. Hill enter the car and drive from the scene. Ms. Solomon positively identified

Hill as the man who shot Fields and Ms. Hill as the woman who watched the shooting and who left in the car with Hill after the shooting.

On cross-examination, Ms. Solomon admitted that although she called 911 after the shooting, she did not tell the operator or the officers on the scene that Hill was the perpetrator or that Ms. Hill had helped him escape the scene. Instead, she called the police the next day. She stated that one of her sons and his girlfriend Delana were with her on the porch when the shooting occurred. She also admitted that in her statement she mixed up which street Ms. Hill entered and the one by which she and Hill left the scene. She stated that one of her sons was the victim of a shooting that occurred a few weeks before this shooting, and she believed that two of the Hill brothers knew about the shooting before it happened and could have tried to prevent it. Nonetheless, she insisted that she did not believe the brothers were actually involved in her son's shooting.

The defense called Delana Humphrey, who testified that she was in the area at the time of the shooting. She saw Loretta Hill pass by in her car and keep going. Ms. Humphrey then walked to the front porch of the building and sat with her daughter and with Ms. Solomon. She heard gunshots, grabbed her daughter, and ran inside Ms. Solomon's apartment. She denied seeing Hill in the neighborhood that day. Ms. Humphrey admitted that both defendants were her cousins. She also admitted that Ms. Hill drove a dark blue Thunderbird. She insisted that she could not see the shooting because it occurred around the corner of the building, out of sight from where she was sitting with Ms. Solomon.

Paul Hay testified that he worked with Ms. Hill at the time of the shooting. On the day of the shooting, they got off work around 3:00 p.m., and Ms. Hill drove both him and another worker to their homes. He estimated that she dropped him off around 3:35 p.m. He did not recall her receiving a cell phone call during the ride to his house.

Chaka Hall testified that she is Hill's fiancée and Ms. Hill's "sister-in-law." She testified that on July 18, she and Hill had planned to attend her family's reunion, but they decided not to do so because of heavy rain that morning. Instead, they decided to stay home and barbeque at their apartment, which was located across the river from the scene of the shooting. She ran various errands, leaving at 10:00 a.m. and returning around 2:00 p.m., and Hill was at home both when she left and when she returned. She and Hill then went to Wal-Mart, and they returned home after shopping. She identified a sales receipt from Wal-Mart showing that the time of checkout was 2:57 p.m. Nonetheless, she admitted that she paid cash for her purchases, and the receipt contained no name of the purchaser. She insisted that Hill did not leave the apartment after they returned from shopping, nor did anyone drive her car that afternoon. She admitted that at the time of the shooting she owned a grey Malibu.

Loretta Hill testified that a neighbor notified her on the evening of July 18, 2004 that police officers were looking at her car, which was parked outside her apartment. When she went to the officers to see why they were interested in her car, they told her that they were investigating a homicide. At the officers' request,

she produced her insurance, driver's license, and registration papers, and she further allowed the officers to search her car.  She told them that the car could not have been involved in a homicide because she was the only person who drove it that day. She agreed to accompany them to the police station, where she gave a taped statement.  The officers asked her if she was Hill's sister, and she stated that she was, but she denied seeing him that day.  Ms. Hill produced her timesheet from work that showed that she got off work at 3:09 p.m. that afternoon.  She drove two co-workers home before going to her own apartment.  She drove home through the project and saw Ms. Solomon and Ms. Humphrey sitting on Ms. Solomon's porch. She denied parking her car there, insisting that she kept driving toward her apartment.  She denied seeing either her brother or Nolan Fields when she drove through the area prior to the shooting.  When she got to her driveway, her boyfriend called to ask her to pick him up from work.  She picked him up in the French Quarter at approximately 4:30 that afternoon.  She denied telling the police she picked up her boyfriend at 3:15, not 4:30 p.m.

On rebuttal, the State recalled Det. Kelly, who testified that the police did not take a taped statement from Ms. Hill.  He reiterated that Ms. Hill told him that she picked up her boyfriend at 3:15, not 4:30.[15]

### III.  Petitioner's Claims

### A.  Sufficiency of the Evidence

Petitioner's first claim is that there was insufficient evidence to support his conviction.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

[Hill] asserts that the evidence did not prove beyond a reasonable doubt that he was the person who shot and killed Nolan Fields.

In reviewing a claim of insufficiency of evidence, courts must apply the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979):  the court must determine whether the evidence, viewed in the light most favorable to the prosecution, "was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt."   State v. Captville, 448 So.2d 676, 678 (La. 1984). See also, State v. Brown, 2003-0897 (La. 4/12/05), 907 So.2d 1; State v. Batiste, 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Sykes, 2004-1199 (La.App. 4 Cir. 3/9/05), 900 So.2d 156.  In addition, when the State uses circumstantial evidence to prove the elements of the offense, "La. R.S. 15:438 requires that 'assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable

---

[15] State v. Hill, No. 2009-KA-0469, 2009 WL 8679213, at *1-4 (La. App. 4th Cir. Dec. 9, 2009); State Rec., Vol. 6 of 13.

hypothesis of innocence.'" State v. Neal, 2000-0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657.  See also Brown; Batiste; Sykes.

Hill was convicted of second degree murder, which is defined by La. R.S. 14:30.1 in pertinent part as:  "the killing of a human being:  (1) When the offender has a specific intent to kill or inflict great bodily harm".  He does not dispute that a second degree murder occurred in this case.  Rather, he argues that the evidence does not support the jury's finding that he was the person who killed Fields.  The sufficiency standard to be employed when a defendant disputes proof of identity was discussed by this court in State v. Stewart, 2004-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639:

When identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979).  State v. Edwards, 97-1797 (La. 7/2/99), 750 So.2d 893; State v. Woodfork, 99-0859 (La.App. 4 Cir. 5/17/00), 764 So.2d 132.  The reviewing court must examine the reliability of an identification according to the test set out in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243 (1977):  (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation.  See State v. Brealy, 2000-2758 (La.App. 4 Cir. 11/7/01), 800 So.2d 1116.  See also State v. Mathieu, 2007-0204 (La.App. 4 Cir. 2/27/08), 980 So.2d 716.

In order to prove that Hill was the person who shot the victim, the State presented Ms. Solomon, who testified while she was sitting on her porch, she saw Hill (whom she recognized) being dropped off by a grey Malibu.  She stated that she saw him enter a building in the project.  She then saw the victim and a person she knew as "Dwanne" walking in the project.  She saw Hill come out of a nearby building and speak with the victim.  She stated that the two men began arguing, with Hill accusing the victim of putting mud in his (Hill's) gas tank.  The argument escalated, and Hill told the victim that he would "deal" with him.  The victim turned and began walking away, and Ms. Solomon heard shots and saw the victim fall.  She then saw him standing over the victim and heard more shots.  Although she testified that she did not see him holding a gun, she testified that Hill's back was to her, and she could not see his hands.  She also testified that the Hill's sister had driven through the project and had parked where she could have seen the shooting, and after Hill shot the victim, he and his sister entered his sister's car, and they drove from the courtyard.  Although Hill's girlfriend testified that he was shopping with her at the time of the shooting, she also admitted that she drove a grey Malibu, the same type of car that Ms. Solomon testified Hill arrived in prior to the shooting.

*The Failure to Exclude Someone Else as the Shooter*

Hill raises two basic arguments concerning the sufficiency of evidence:  (1) he contends that Ms. Solomon's testimony did not exclude the possibility that

someone else shot the victim; and (2) he argues that Ms. Solomon's testimony was not credible. Neither of these arguments has merit.

With respect to the possibility that someone else shot the victim, the [sic] Hill points out that Ms. Solomon testified that she did not see a gun in his hand prior to the shooting. She testified, however, that she could not see his hands because he was standing with his back to her. He notes that Ms. Solomon admitted that her attention was not riveted on the argument preceding the shooting. She testified nonetheless that she saw Hill and the victim arguing, and once she heard the first shot, she looked up and saw the victim fall to the ground. She testified that she saw him stand over the victim while more shots rang out.

Hill asserts that he could not have been the shooter because according to Ms. Solomon, he was standing near the victim, arguing with him. He points out that the forensic pathologist testified that the shots were "distant" shots; thus, he cannot have been the shooter. He mischaracterizes the pathologist's testimony. Dr. Traylor testified that based upon the lack of gun powder residue on the victim in the areas where the gunshots entered the parts of his body that were not covered by clothing, the lack of residue indicated that the shots were fired from a distance of at least eighteen inches to several feet from the victim. As noted by the State in its brief, two of the shots entered the victim's body in an area covered by clothing and entered in a downward trajectory, which would have been consistent with the victim being shot while someone was standing over him.

Hill notes that Ms. Solomon admitted that when she first reported the crime, she did not name him as the shooter, nor did she give the police a description of the shooter. He also points out that she first told the police that she was approximately four hundred feet from the shooting when it occurred. Ms. Solomon admitted both of these factors, but she insisted that with respect to her distance from the shooting, she had a hard time estimating distances. At trial, Ms. Solomon estimated this distance in relation to objects in the courtroom, and this estimate was ten to fifteen feet.

Hill concludes this argument by asserting that the evidence did not exclude the reasonable possibility that Dwanne or someone else was the shooter. He points out that there was no physical evidence to tie him to the shooting, either on the scene or in his sister's car. He notes that Ms. Solomon's testimony was silent as to where Dwanne was at the time of the shooting. He also notes that the victim's sister, who told Det. Kelly at the hospital that Hill shot her brother, did not give this information to the police when she identified her brother at the scene of the shooting. He avers that the State did not present any evidence to corroborate Ms. Solomon's testimony. However, the Supreme Court has noted: "[w]here there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by the trier of fact, is sufficient support for a factual conclusion required for a verdict of guilty." State v. Marcantel, 2000-1629, p. 9 (La. 4/3/02), 815 So.2d 50, 56. See also State v. Stewart, 2004-2219 (La.App. 4 Cir. 6/29/05), 909 So.2d 636. Ms. Solomon positively identified Hill as the man whom she saw arguing with the victim just prior to the shooting and who was standing over him

while several more shots were fired into his body. Thus, the lack of any physical evidence tying him to the shooting does not render the jury's verdict invalid.

Hill cites several cases where the reviewing courts have found insufficiency of evidence, and he argues that these cases mandate the reversal of his conviction. These cases can be easily distinguished from the present case because in none of them was there a eyewitness that directly implicated the defendant. This court reversed the defendant's negligent homicide conviction in State v. Fenner, 94-1498 (La.App. 4 Cir. 11/16/95), 664 So.2d 1315 because the testimony of the various State's witnesses conflicted with that of the others as to whether the victim was shot by the defendant/police officer during a struggle. In State v. Vidrine, 521 So.2d 472 (La.App. 4 Cir. 1988), this court reversed the defendant's conviction because there was nothing to disprove the hypothesis that the gun that the victim picked up did not accidentally fire when the defendant tried to take it away from her. Likewise, this court reversed the defendant's conviction in State v. Monds, 91-0589 (La.App. 4 Cir. 1/14/94), 631 So.2d 536. The State's case was purely circumstantial. Officers saw a woman who resembled the victim and was dressed similarly to her get into a vehicle prior to the murder, and the defendant was implicated because he drove a vehicle that was similar to the suspect vehicle. Although there were a few small bloodstains found on the outside of the defendant's car, there was no physical evidence that linked him to the victim or to the murder.

Likewise, the cases from other courts cited by Hill are distinguishable. The Third Circuit reversed the defendant's conviction as a principal to second degree murder in the death of a man to whom he had sold the oxycontin that caused the victim's overdose. State v. Chambers, 2005-1517 (La.App. 3 Cir. 5/24/06), 933 So.2d 200. In State v. Williams, 423 So.2d 1048 (La. 1982), the Court reversed the defendant's conviction because the physical evidence did not exclude as the murderer another suspect who was with the victim on the night of her murder.

The cases cited by Hill are not persuasive that the State failed to exclude the hypothesis that someone other than him shot the victim. This claim has no merit.

*The Credibility of the Eyewitness*

The remainder of the Hill's sufficiency argument is an attack on Ms. Solomon's credibility. This argument also fails. An appellate court's function is not to reassess the credibility of witnesses. Rather, credibility determinations are within the sound discretion of the fact finder, who must consider conflicting testimony as to factual matters as to the weight of the evidence. The fact finder is free to accept or reject any portion or the entirety of any witness' testimony. A fact finder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. See Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211 (1982); State v. Johnson, 20090-0259 (La.App. 4 Cir. 9/16/09), ___ So.3d ___, 2009 WL 2960686; State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432.

Hill incorporates some of the above-listed factors into his credibility argument, including the facts that Ms. Solomon failed to mention to the police on the scene that he was the perpetrator, that she initially estimated that she was four hundred feet from the shooting, and that she did not give the police a description of the perpetrator. In addition, he points out that Ms. Solomon's account to the police of the route his sister allegedly took through the courtyard just prior to the shooting was different than that she gave at trial. At trial, Ms. Solomon acknowledged this difference and explained to the jury that she had mistakenly reversed Ms. Hill's route when she told the police. Nonetheless, using either route, Ms. Solomon's testimony placed Ms. Hill driving through the courtyard just prior to the shooting and parking at a place where she could see the shooting.

Hill's biggest argument is that Ms. Solomon's testimony that she could see the shooting was refuted by that of Ms. Humphrey, who testified that she and Ms. Solomon were sitting on Ms. Solomon's front porch at the time of the shooting, rather than her back porch, and they could not see the shooting. He also cites Ms. Humphrey's testimony that she was not present for the shooting. However, even taking Ms. Humphrey's testimony as true, she could not exonerate him as the shooter because if she was where she testified she was, she would not have been able to see the shooting and would not have known who the perpetrator was. In addition, Ms. Humphrey admitted that she is Hill's cousin.

The jury was aware of all of the "inconsistencies" listed by Hill, and it still chose to believe Ms. Solomon's testimony over that of Ms. Humphrey. Given the evidence adduced at trial, there is no showing that the jury abused its discretion in its credibility finding.

The cases cited by Hill do not mandate a different finding. The Court found that the victim's testimony concerning an alleged armed robbery in State v. Mussell, 523 So.2d 1305 (La. 1988) was so contradictory as to render it unbelievable. There was no physical evidence to tie the defendant to the armed robbery, and the victim's testimony cast doubt upon whether an armed robbery even occurred. Likewise, in State v. Woodfork, 99-0859 (La.App. 4 Cir. 5/17/00), 764 So.2d 132, the victim of a purse snatching caught a brief glimpse of her assailant. Three months later, the defendant entered her office for counseling. She did not recognize him at that point, but many minutes into his subsequent counseling session, the victim became uneasy with him and started to wonder whether the defendant was the purse snatcher because he was the same general build as the assailant and was wearing clothing similar to that worn by the perpetrator. Because she was unsure, she waited almost a week before contacting the police. She later chose the defendant's picture from a photographic lineup. A witness to the purse snatching also made a tentative identification, but he admitted that he did not see the robber's face. The defendant presented evidence that he was at work at the time of the purse snatching. This court reversed his conviction, finding that the victim's identification of him as the perpetrator did not negate a reasonable probability of misidentification.

      Despite Hill's arguments concerning Ms. Solomon's lack of credibility, the jury nonetheless found her testimony credible. There is nothing in the record before this Court that would show that the jury abused its discretion in so finding.

      In conclusion, the evidence adduced at trial was sufficient for the jury to find beyond a reasonable doubt that Hill was the person who shot and killed Nolan Fields. This assignment has no merit.[16]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[17]

Because a claim challenging the sufficiency of the evidence presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Davila v. Davis, 650 Fed. App'x 860, 866 (5th Cir. 2016). For the following reasons, the Court finds that he has made no such showing.

As the Louisiana Fourth Circuit Court of Appeal correctly noted, claims challenging the sufficiency of the evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979). In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact

---

[16] State v. Hill, No. 2009-KA-0469, 2009 WL 8679213, at *5-10 (La. App. 4th Cir. Dec. 9, 2009); State Rec., Vol. 6 of 13.

[17] State v. Hill, 45 So. 3d 1093 (La. 2010); State Rec., Vol. 12 of 13.

"twice-deferential." Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman v. Johnson, 566 U.S. 650, 651 (2012).

Further, it must be remembered that in these federal proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. For example, the state court opinion references Louisiana's rule that the state is required to negate any reasonable probability of misidentification; however, that rule, which is not dictated by Jackson, simply does not apply in this federal court. Williams v. Cain, 578 Fed. App'x 462, 463-64 (5th Cir. 2014); Torregano v. Vannoy, Civ. Action No. 14-1568, 2016 WL 6477045, at *7 (E.D. La. June 29, 2016), adopted, 2016 WL 6441231 (E.D. La. Nov. 1, 2016).

In the instant case, petitioner concedes that the elements of second degree murder were established at trial; his claim is merely that the state failed to prove that he was the perpetrator. However, at trial, Troy Lynn Solomon identified petitioner and testified that, although she did not actually see a gun in his hand, she witnessed him argue with the victim, heard shots as the victim walked away, saw the victim fall to the ground, and then saw petitioner standing over the victim as more shots rang out. That obviously sufficed for the jurors to conclude that Solomon witnessed petitioner shoot the victim, and it is clear that a single, uncorroborated eyewitness identification, if found credible by the trier of fact, is sufficient to prove identity and support a conviction under federal law. United States v. King, 703 F.2d 119, 125 (5th Cir. 1983); accord Davis v. Cain, Civ. Action No. 15-6652, 2016 WL 4537915, at *7 (E.D. La. May 24, 2016), adopted, 2016 WL 4529877 (E.D. La. Aug. 30, 2016); Colbert v. Cain, Civ. Action No. 14-2472, 2016 WL 4186551, at *11 (E.D. La. Apr. 12, 2016), adopted, 2016 WL 4161257 (E.D. La. Aug. 5, 2016); Phillips v.

Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *13 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012).

Additionally, petitioner's argument that the jurors should not have found Solomon credible is misplaced. Credibility determinations are the province of the jurors, and a federal habeas court generally will not grant relief on a sufficiency claim grounded on such matters of credibility. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips, 2012 WL 2564926, at *14; Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

Again: the question before this Court is not "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original; citation and quotation marks omitted). In other words, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (emphasis added) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)). Therefore:

> [A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ... Because rational people can sometimes disagree, the inevitable

consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Cavazos v. Smith, 565 U.S. 1, 2 (2011).

Mindful of these stringent standards of review, the Court finds that, when the evidence in the instant case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*.  Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, petitioner's claim for relief should be denied.

## B.  Ineffective Assistance of Counsel

Petitioner next claims that he received ineffective assistance of counsel at trial. Specifically, he argues that his counsel was ineffective for (1) laboring under a conflict of interest, (2) failing to effectively present an alibi defense, and (3) eliciting testimony from a state witness regarding an identification that the court had previously suppressed.

In the post-conviction proceedings, the state district court denied those claims, holding:

First, Mr. Hill and his attorney argue that "[t]rial counsel is ineffective where there is a conflict of interest."  Mr. Hill asserts that "[a] right to conflict free counsel can only be waived knowingly, and intelligently in court when a conflict has occurred and defendant's defense attorney has informed the court of the conflict."

Louisiana Code of Criminal Procedure Art. 930[.2], "Burden of proof," states:

The petitioner in an application for post conviction relief shall have the burden of proving that relief should be granted.

Louisiana Code of Criminal Procedure Art. 517, "Joint representation of co-defendants; duty of court" reads as follows:

A.  Whenever two or more defendants have been jointly charged in a single indictment or have moved to consolidate their indictments at trial, and are represented by the same retained or appointed counsel or by retained or appointed counsel who are associated in the practice of law, the court shall inquire with respect to such joint representation and shall advised each defendant on the record of his right to separate representation.

B.  Unless it appears that there is good cause to believe that no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

In State v. Miller, 792 So.2d 104, (La. App. 4 Cir. 2001), two defendants were convicted of Distribution of Marijuana, and one of the defendants was additionally convicted of Possession of Marijuana with Intent to Distribute.  Both defendants appealed.  The Court of Appeal, Fourth Circuit held that the trial court's failure to inquire with respect to joint representation of the defendants and to advise each of them on the record of the right to separate representation did not violate the right to effective assistance of counsel.  In ruling, the Fourth Circuit discussed the following:

… the failure of the trial court to inquire into the joint representation on the record does not rise to the level of a denial of a constitutional right.  Moreover, because no objection was made prior to trial and no motion for separate counsel was made because of counsel's perceived conflict the violation was waived.

In this case, the trial court did in fact inquire about Defense counsel's joint representation of Mr. Hill and his co-defendant on the record.  While Mr. Hill now argues that there was a conflict, prior to the commencement of trial, he knowingly and intelligently waived his rights with regard to co-representation.  Included with Mr. Hill's application for Post Conviction Relief is the partial transcript, wherein the trial court addressed the possible conflict of interest as follows:

The Court:    I don't know if we've done this before, Mr. Irons, but I just want to address the conflict issue, whether or not there is potential conflict of interest for you to represent both of the defendants.  I'm sure you have had the opportunity to review all the evidence and determine whether or not there was a conflict.  And if there is a possible conflict are either one of your clients or both, waiving potential conflict.

18

| | |
|---|---|
| Mr. Irons: | Yes Judge, my assessment of the evidence and our appreciation of the defense dos [sic] not contemplate a conflict, but we can certainly put on the record as to each defendant if you have any objections to my representing both of you. |
| Ms. Hill: | No[.] |
| Mr. Irons: | And if in fact you would waive – |
| The Court: | Let's do it on the record.  Mr. Ulyssess [sic] Hill, do you believe that it is a conflict for you to be represented by the same lawyer as Ms. Loretta Hill is being represented by? |
| Mr. Hill: | No ma'am. |
| The Court: | And Mr. [sic] Loretta Hill, do you have a problem being represented by the same lawyer that Mr. Ulysses Hill is being represented by …. |
| Ms. Hill: | No, ma'am. |
| The Court: | And you don't see a conflict in him representing the two of you in this one case. |

Based on the waivers made in open court by both defendants, the trial judge proceeded with trial.  Thus, the trial judge complied with the Louisiana Code of Criminal Procedure Art. 517.  Mr. Hill has not presented any evidence to support his argument that his waiver was not made knowingly and intelligently.  As it is Mr. Hill's burden to prove such, the Court denies this claim.

    ….

In his second claim, Mr. Hill argues that "[t]rial counsel was ineffective when he failed to provide the state with notice of an alibi witness where the testimony of the witness would have supported [his] defense." Mr. Hill asserts that the testimony of the alibi witness, Mr. Melvin Lastie, would have placed Mr. Hill with him at the time of the alleged shooting.

The test for effectiveness of counsel is two-pronged:  (1) the defendant must show that counsel made errors so serious that he was not functioning as guaranteed by the Sixth Amendment; and (2) the defendant must show that the deficient performance prejudiced the defense by proving that counsel's errors were so serious

as to deprive the defendant of a fair trial, a trial whose result is reliable.[FN 12] The defendant has the burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."[FN 13]  The assessment of an attorney's performance requires that his conduct be evaluated from counsel's perspective at the time of the occurrence.[FN 14]  A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming that counsel has exercised reasonable professional judgment.

[FN 12]  Strickland v. Washington, 466 U.S. 668 (1984); State ex rel. Busby v. Butler, 538 So.2d 164 (La. 1988).

[FN 13]  State v. Porche, 780 So.2d 1152, 2000-1391 (La. App. 4 Cir. 2/14/01) (quoting Strickland, 466 U.S. at 695).

[FN 14]  Mattheson v. King, 751 F.2d 1432 (5th Cir. 1984).

In Mr. Hill's 2009 appeal, he argued that the evidence was insufficient to support his conviction.  In response, the Fourth Circuit discussed the following:

Hill was convicted of second degree murder, which is defined by La. R.S. 14:30.1 in pertinent part as:  "the killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm".  He does not dispute that a second degree murder occurred in this case.  Rather, he argues that the evidence does not support the jury's finding that he was the person who killed Fields. The sufficiency standard to be employed when a defendant disputes proof of identity was discussed by this court in State v. Stewart, 2004-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639:

[....]

In order to prove that Hill was the person who shot the victim, the State presented Ms. Solomon, who testified while she was sitting on her porch, she saw Hill (whom she recognized) being dropped off by a grey Malibu.  She stated that she saw him enter a building in the project.  She then saw the victim and a person she knew as "Dwanne" walking in the project.  She saw Hill come out of a nearby building and speak with the victim.  She stated that the two men began arguing, with Hill accusing the victim of putting mud in his (Hill's) gas tank.  The argument escalated, and Hill told the victim that he would "deal" with him.  The victim turned and began walking away, and Ms. Solomon heard shots and saw the victim fall. She then saw him standing over the victim and heard more shots.

Although she testified that she did not see him holding a gun, she testified that Hill's back was to her, and she could not see his hands. She also testified that the Hill's sister had driven through the project and had parked where she could have seen the shooting, and after Hill shot the victim, he and his sister entered his sister's car, and they drove from the courtyard. Although Hill's girlfriend testified that he was shopping with her at the time of the shooting, she also admitted that she drove a grey Malibu, the same type of car that Ms. Solomon testified Hill arrived in prior to the shooting.

[….]

Despite Hill's arguments concerning Ms. Solomon's lack of credibility, the jury nonetheless found her testimony credible. There is nothing in the record before this Court that would show that the jury abused its discretion in so finding.

In conclusion, the evidence adduced at trial was sufficient for the jury to find beyond a reasonable doubt that Hill was the person who shot and killed Nolan Fields.

Defense counsel also presented testimony during the trial. Specifically, Defense counsel called Mr. Hill's fiancée, Chaka Hall, to testify. Ms. Hall's testimony was as follows:

… on July 18, she and Hill had planned to attend her family's reunion, but they decided not to do so because of heavy rain that morning. Instead, they decided to stay home and barbeque at their apartment, which was located across the river from the scene of the shooting. She ran various errands, leaving at 10:00 a.m. and returning around 2:00 p.m., and Hill was at home both when she left and when she returned. She and Hill then went to Wal-Mart, and they returned home after shopping. She identified a sales receipt from Wal-Mart showing that the time of checkout was 2:57 p.m. Nonetheless, she admitted that she paid cash for her purchases, and the receipt contained no name of the purchaser. She insisted that Hill did not leave the apartment after they returned from shopping, nor did anyone drive her car that afternoon.

Mr. Hill has not met his burden of proving that trial counsel's error of failing to provide notice of an alibi witness was so serious as to deprive him of a fair trial. The victim in this case was shot approximately minutes before 4:00 pm. During trial, Mr. Hill's girlfriend, Ms. Hall, testified that he was with her throughout the day and did not leave the apartment until 3:00 pm. Mr. Hill argues, however, that

the testimony of Mr. Lastie would have proved that they were together at the time of the shooting. Mr. Hill's assertion regarding the testimony of Mr. Lastie directly contradicts Ms. Hall's testimony that Mr. Hill did not leave the apartment that afternoon once they returned from shopping. In addition, during trial, the State presented an eye-witness who placed both Mr. Hill and his co-defendant at the scene of the crime. As stated by the Fourth Circuit, the jury found the eye witness's testimony credible over that of Ms. Hall's. Therefore, just as the Fourth Circuit held, the evidence adduced at trial was sufficient for the jury to find beyond a reasonable doubt that Mr. Hill was the person who shot and killed the victim. Thus, Mr. Hill has failed to meet his burden to establish but for trial counsel failing to produce Mr. Lastie as an alibi witness, the outcome of the trial would have varied. As Mr. Hill has failed to meet his burden, the Court denies this claim.

[….]

On behalf of Mr. Hill, his attorney asserts that "[t]rial counsel allowed a suppressed identification by 'mistake' to be presented to the jury." Counsel believes that "[b]y Mr. Irons 'mistake' the jury learns that the witness participated in an investigation process. That witness later identified Mr. Hill as the perpetrator."

As per Louisiana Code of [Criminal] Procedure Art. 930[.2] "Burden of Proof", it is the petitioner's burden to prove that relief should be granted. In this instance, although Defense counsel provided a transcript of arguments presented at trial, Defense counsel failed to provide any factual basis or documents to support his claim that a suppressed identification was in fact presented at trial. Therefore, the Court denies this claim.[18]

The Louisiana Fourth Circuit Court of Appeal then likewise denied relief, holding:

Relator argues that he received ineffective assistance of counsel. He argues that his trial counsel had a conflict of interest due to his joint representation of relator and his codefendant sister, and that the trial of the two defendants should have been severed. He also argues that his trial counsel failed to give notice of an alibi witness, and allowed a previously suppressed identification to be introduced into evidence. …

We have reviewed the claims presented by the relator, and have determined that the trial court did not err in denying the application for post-conviction relief. See La. C.Cr.P. arts. 930.2 and 930.4. State v. Brown, 527 So.2d 12, 14 (La.App. 3 Cir. 1988). Further a strategic decision by defense counsel not to call Melvin Lastie[FN 1] as an alibi witness does not render defense counsel ineffective. Defense counsel was privy to evidentiary law, as this court has previously determined,[FN 2] because he knew he did not have to file a notice of an alibi when

---

[18] State Rec., Vol. 11 of 13, Judgment dated December 10, 2015, pp. 2-8 (footnotes omitted).

the state failed to seek discovery on the issue; the trial court permitted alibi testimony from Chaka Hall.  It is unlikely that the jurors would have believed Mr. Lastie's testimony in light of Ms. Hall's testimony.

> [FN 1]  Mr. Lastie failed to appear on the second day of trial and the defense did not seek a continuance as a result thereof.

> [FN 2]  State v. Hill, 06-1554, unpub. (La.App. 4 Cir. 2/21/07).[19]

The Louisiana Supreme Court then denied petitioner's related writ application, stating: "Relator fails to show he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[20]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claims on the merits unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140,

---

[19] State v. Hill, No. 2016-K-0064 c/w No. 2016-K-0120 (La. App. 4th Cir. Mar. 30, 2016); State Rec., Vol. 11 of 13.
[20] State *ex rel.* Hill v. State, 225 So.3d 470 (La. 2017); State Rec., Vol. 13 of 13.

> 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  <u>Ibid</u>.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult.  *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 105 (emphasis added; citations omitted).  Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt."  <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).  For the following reasons, the Court finds that, under those stringently deferential

standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

As the state court correctly noted, Strickland established a two-prong test for evaluating most types of claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief on such a claim is required to show both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland, 466 U.S. at 697. A petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct

of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

That said, the Strickland analysis does not apply to every type of ineffective assistance claim.  Of importance here, a different analysis applies to claims of ineffective assistance based on a purported *conflict of interest*.  Specifically, as the United States Fifth Circuit Court of Appeals has explained:

> A petitioner alleging a Sixth Amendment violation on the basis of counsel's purported conflict of interest, however, must bear a slightly different burden.  In Cuyler v. Sullivan, [446 U.S. 335, 345 (1980),] the Supreme Court considered whether "the mere possibility of a conflict of interest warrants the conclusion that the defendant was deprived of his right to counsel," and noted with approval its prior holding that there are circumstances under which an attorney may represent multiple criminal defendants in connection with the same criminal transaction without offending the Sixth Amendment.  The Court held that if the defendant did not object to the multiple representation at trial, such an arrangement can only give rise to a cognizable IAC claim if it actually affected the adequacy of the petitioner's representation.   In a later gloss on the Sullivan standard, the Court reiterated that an actual conflict, for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.  If the defendant establishes the existence of such a conflict, though, the prejudice prong of Strickland is relaxed such that the petitioner need not show that but for counsel's unprofessional errors, the result of the proceeding would have been different.
> The crux of the inquiry, therefore, is whether trial counsel had a conflict of interest that hampered the representation in the sense that counsel actively

26

> represented conflicting interests.  A conflict will exist only when counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.  Such a conflict does not arise, however, when the alleged conflict is merely hypothetical, speculative, or potential.  Relevant factors may include (1) whether the attorney has confidential information that is helpful to one client but harmful to the other client; (2) whether and how closely related is the subject matter; (3) how close are the multiple representations in time; and (4) whether the prior representation has terminated.  As we have noted, <u>Sullivan</u>'s 'actual conflict' and 'adverse effect' elements are rather vague, so IAC claims predicated on such conflicts are tightly bound to the particular facts.

<u>Morin v. Thaler</u>, 374 Fed. App'x 545, 551-52 (5th Cir. 2010) (emphasis omitted; footnotes, quotation marks, and brackets omitted); <u>accord</u> <u>Perillo v. Johnson</u>, 205 F.3d 775, 806 (5th Cir. 2000) ("<u>Cuyler</u>'s adverse effect standard is set intentionally lower than <u>Strickland</u>'s actual prejudice standard. …  Under <u>Cuyler</u>, the focus is upon whether the actual conflict burdening counsel's performance had an actual and adverse effect on counsel's performance.  Once it is established that there was an adverse effect on counsel's performance, prejudice, in terms of an effect on the outcome of the defendant's trial, is presumed.").

With respect to petitioner's conflict of interest claim, the state courts correctly noted that petitioner not only failed to lodge an objection to the joint representation, but he in fact affirmatively consented to it on the record.  Courts "have long held that, like the right to counsel of any kind, the right to conflict-free counsel can be waived.  For a waiver to be effective, the record must show that the trial court determined that it was knowingly, intelligently, and voluntarily done …."  <u>United States v. Greig</u>, 967 F.2d 1018, 1021 (5th Cir. 1992); <u>accord</u> <u>Sealed Appellee v. Sealed Appellant</u>, No. 17-50487, 2018 WL 3965588, at *4 (5th Cir. Aug. 17, 2018).  "The responsibility for ensuring that waivers satisfy the Supreme Court's requirements belongs to the trial judge.  *But federal courts must presume the correctness of the state courts' factfinding*

*underlying a waiver determination according to AEDPA's exacting test.* 28 U.S.C. § 2254(e)(1)."

McCamey v. Epps, 658 F.3d 491, 499 (5th Cir. 2011) (emphasis added). The AEDPA provision

cited in McCamey provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be *presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.*

28 U.S.C. § 2254(e)(1) (emphasis added). Here, petitioner has presented no evidence, much less

clear and convincing evidence, to overcome the presumption of correctness attached to the state

court's finding of a valid waiver of conflict-free counsel.

However, that does not necessarily end the matter. Even in cases where there has been a

knowing, intelligent, and voluntary waiver, "[a]n accused's right to waive conflict-free

representation is not absolute. If the conflict is so severe as to render a trial inherently unfair, then

the integrity of the judicial system has been undermined, and the accused has been deprived of his

right to effective assistance of counsel." United States v. Vaquero, 997 F.2d 78, 90 (5th Cir. 1993);

cf. United States v. Josefik, 753 F.2d 585, 588 (7th Cir. 1985) (noting that there are, of course,

limits to waivers; "if the parties stipulated to trial by 12 orangutans the defendant's conviction

would be invalid notwithstanding his consent, because some minimum of civilized procedure is

required by community feeling regardless of what the defendant wants or is willing to accept").

Nevertheless, there is simply no reasonable basis to conclude that the joint representation in the

instant case rendered petitioner's trial inherently unfair, and so this claim should be rejected.

Petitioner's remaining two ineffective assistance claims are straightforward Strickland claims which require the traditional showing of both deficient performance and resulting prejudice. For the following reasons, neither of those claims have merit.

As to petitioner's claim that his counsel was ineffective for failing to effectively present an alibi defense, petitioner specifically argues that counsel should have requested a recess to secure the presence of Melvin Lastie, a missing alibi witness, rather than choosing to rely solely on the testimony of Chaka Hall, the other alibi witness.

A decision by counsel concerning whether to seek a recess is a strategic choice generally accorded great deference. See, e.g., Wilborn v. United States, No. CIV-4186, 2013 WL 4552858, at *3 (D.S.D. Aug. 28, 2013). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689. Moreover, it is irrelevant that another attorney might have made other choices or handled such issues differently. As the Supreme Court noted: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id.

Here, however, this Court need not determine whether counsel performed deficiently in failing to seek a recess because, in any event, petitioner's claim clearly fails on the prejudice prong of the Strickland analysis. To establish that prejudice resulted, petitioner must show that if a recess had been granted and the presence of Lastie had been secured, then there is a reasonable probability that "the result of the proceeding would have been different." See Strickland, 466 U.S. at 694.

That requires a showing that Lastie would have testified in a manner favorable to the defense. Because petitioner has presented no evidence whatsoever, such an affidavit from Lastie, to prove that Lastie's testimony at trial would in fact have been favorable to the defense, petitioner has not established that he was prejudiced by Lastie's failure to testify.  See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"; petitioner, who failed to produce affidavit from uncalled witness, could not establish prejudice); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").  Therefore, this claim fails.

As to petitioner's claim that counsel was ineffective for eliciting testimony from a state witness regarding an identification which the court had previously suppressed, that claim is likewise meritless.  Prior to trial, the judge suppressed petitioner's identification by Troy Lynn

Solomon during a photographic lineup.[21]  However, when defense counsel was cross-examining

Detective James Kelly about the fact that he recorded a statement from Troy Lynn Solomon, the

following exchange took place:

> Q.    Before you recorded her statement, was there any period at all in which you discussed this incident with Ms. Solomon before you hit the record button?
>
> A.    I just showed her – yes.
>
> Q.    The substance of her –
>
> A.    What?
>
> Q.    The substance of her statement?
>
> A.    No.  The –
>
> BY MS. RISH  [the prosecutor]:
>    Objection, Your Honor, approach?
>
> BY THE COURT:
>    No.
>
> BY THE WITNESS:
>    We discussed – I showed her the lineup, the photographic line with Mr. Hill.[22]

The questioning then continued with no further mention of the lineup.

The foregoing exchange was later discussed at length in chambers.[23]  During that

discussion, it was apparent that the judge believed that, for whatever reason, defense counsel was

intentionally "opening the door" to testimony concerning the suppressed identification.  Defense

counsel said that was incorrect and explained that he was instead simply attempting to ask whether

---

[21] State Rec., Vol. 1 of 13, minute entry dated February 1, 2005.
[22] State Rec., Vol. 4 of 13, transcript of March 15, 2005, p. 34.
[23] Id. at pp. 37-48.

Kelly and Solomon had discussed the substance of her statement prior to the recording.  The prosecutor argued that the door had nevertheless been opened and that she should therefore be allowed to further question Kelly about the identification during re-direct examination.  The judge denied that request, and no further questions were asked regarding the identification made pursuant to the lineup.

Although the phrasing of counsel's question was inartful and led to Kelly's unfortunate passing reference to the photographic lineup, the Court cannot say that petitioner was ultimately prejudiced.  The suppression of the identification from the lineup stood, with the prosecutor not being allowed to either introduce the lineup or ask any questions about it.   Under these circumstances, there is simply no reasonable probability that the result of the proceeding would have been different if only Kelly's passing reference to an unexplained lineup had not occurred. Therefore, this claim likewise fails.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not made that showing in the instant case. Accordingly, utilizing the AEDPA's deferential standards of review applicable to such claims, this Court should likewise deny relief.

## C.  Denial of Fair Trial

Lastly, petitioner claims that his trial was unfair because trial counsel was not given access to the rap sheets of the potential jurors.  In the post-conviction proceedings, state district court denied that claim, holding:

> In his final argument, Defense counsel contends that Mr. Hill was denied a
> fair trial due to the use of NCIC Rap Sheets run on the jury venire.  Defense counsel

argues that "[t]here has existed for decades the practice of the District Attorney for Orleans Parish running 'rap sheets' as to prospective jurors that practice has been repeatedly condemned by reviewing courts for many years now."

In <u>State v. Wiggins</u>, 556 So.2d 622 (La. App. 5 Cir. 1990), the defendant was convicted of Aggravated Burglary and Attempted Aggravated Rape and appealed. The Court of Appeal held that the trial court's denial of the defendant's motion for the State to produce the rap sheet of the prospective jurors did not violate the defendant's right to due process. In ruling, the Fifth Circuit discussed the following:

> [The] defendant contended that the trial judge erred in denying his motion for the State to produce the rap sheets of prospective jurors. In this respect he argues the denial resulted in a violation of his right to due process. He argues the State has access to such records and that without the information he could not conduct a full voir dire examination and could not secure information giving him a basis for exercising his peremptory challenges or challenges for cause.
>
> A defendant on trial has the right to a full and complete voir dire examination of potential jurors. LSA-Const. Art 1, 17; LSA-C.Cr.P. art. 786. The purposes of the voir dire examination are to allow for the evaluation of the qualifications of prospective jurors by testing their impartiality and competency, and in order to discover the basis for the intelligent exercise of peremptory challenges and/or challenges for cause. <u>State v. Gabriel</u>, 542 So.2d 528 (La.App. 5 Cir. 1989).
>
> The defendant should be given wide latitude during voir dire. <u>State v. Jackson</u>, 450 So.2d 621 (La. 1984). **This does not mean, however, that a defendant is necessarily entitled to the rap sheets of prospective jurors.** <u>State v. Jackson</u>, supra; <u>State v. Weiland</u>, 540 So.2d 1288 (La.App. 5 Cir. 1989). Consideration must be given to the particular facts and circumstances in each case. In addition, a trial judge has great discretion in his rulings on the scope of voir dire and those rulings will not be disturbed absent a clear abuse of discretion. <u>State v. Jackson</u>, supra. [Emphasis Added.]
>
> In this case, while the trial judge denied the motion for production of the prospective jurors' rap sheets, he also ordered the State to provide defendant with any arrest or conviction information used by it to challenge any juror for cause. In addition, the State had already voluntarily provided defense with certain arrest information it relied on to challenge a particular prospective juror for cause. Under these

33

> circumstances, we find the defendant's voir dire rights were fully
> protected and that the trial judge did not err in denying defendant's
> motion.
>
> In <u>Wiggins</u>, the State made cause challenges based on arrest information of
> potential jurors.  In this instance, Counsel has not outlined any challenges for cause
> made by the State that were based on arrest information.  Instead, Defense counsel
> states that during trial, Mr. Hill was not in possession of the rap sheets of the
> potential jurors.  Barring any information to support the theory that the District
> Attorney used NCIC Rap Sheets to challenge perspective [sic] jurors for cause, this
> Court finds this claim to be without merit.[24]

The Louisiana Fourth Circuit Court of Appeal then likewise denied relief,[25] as did the Louisiana

Supreme Court which similarly found that petitioner failed to meet his burden of proof pursuant

to Louisiana Code of Criminal Procedure article 930.2.[26]

Federal habeas corpus relief may be granted only to remedy violations of the Constitution

and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. § 2254(a)

("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an

application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment

of a State court *only on the ground that he is in custody in violation of the Constitution or laws or*

*treaties of the United States*." (emphasis added)); <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1983).

Therefore, whether Louisiana law required the prosecutor to provide the potential jurors' rap sheets

to the defense is immaterial for this Court's review; the only question of moment here is whether

*federal* law imposes such a requirement.  In its response, the state argues:  "Hill does not cite, and

the undersigned has not seen, any [United States] Supreme Court case holding that prosecutors

---

[24] State Rec., Vol. 11 of 13, Judgment dated December 10, 2015, pp. 8-10 (footnotes omitted).
[25] <u>State v. Hill</u>, No. 2016-K-0064 c/w No. 2016-K-0120 (La. App. 4th Cir. Mar. 30, 2016); State Rec., Vol. 11 of 13.
[26] <u>State *ex rel*. Hill v. State</u>, 225 So.3d 470 (La. 2017); State Rec., Vol. 13 of 13.

have an obligation to share veniremen's rap sheets."[27]  This Court is likewise unaware of any such

obligation under the federal law.  Therefore, this claim should be denied.

## <u>RECOMMENDATION</u>

It is therefore **RECOMMENDED** that the federal application seeking habeas corpus relief

filed by Ulysses Hill be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation in a magistrate judge's report and recommendation within fourteen (14) days after

being served with a copy shall bar that party, except upon grounds of plain error, from attacking

on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the

district court, provided that the party has been served with notice that such consequences will result

from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d

1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this eleventh day of September, 2018.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[27] Rec. Doc. 15, p. 6.